UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE UNIVERSITY OF TEXAS SYSTEM and THE UNIVERSITY OF HOUSTON SYSTEM, | § § § § | |
| Plaintiffs, | § § | Civil Action No. 4:17-cv-02588 |
| v. | § § | |
| ALLIANTGROUP, LP and WHRA MERGER SUB II, INC. f/k/a WHR ARCHITECTS, INC., | § § § | |
| Defendants. | | |

## FIRST AMENDED COMPLAINT

COME NOW The University of Texas System and The University of Houston System ("Plaintiffs"), and file this action against Defendants alliantgroup, LP and WHRA Merger Sub II, Inc., showing to the Court as follows:

## I.   INTRODUCTION

1.      This Complaint involves a nationwide scheme by Alliant, alone and in conjunction with numerous contractors, to obtain Section 179D tax deductions ("§179D deduction") from thousands of governmental entities without any compensation.  This scheme costs taxpayers millions of dollars—every year—by providing a windfall to private companies which do not provide any additional work or value to the governmental entities in exchange for the §179D allocations.

2.      In 2005, Congress passed a law to encourage the construction of energy-efficient buildings by providing tax deductions to the buildings' owners. For buildings constructed by governmental entities (which do not pay income taxes), the law allows the governmental entities to "allocate"—in other words, assign—the §179D deduction to the private parties that design the energy-efficient buildings.

3.      There is no federal authority or precedent that prohibits a governmental entity from receiving value in return for an allocation of the §179D deduction.  In fact, the framework and legislative intent of Section §179D supports a governmental entity's right to receive value in exchange for the allocation.

4.      In the commercial context, the §179D deduction reduces the ultimate net cost of the energy efficiency buildings and systems, and increases the property owner's return on investment.  Directing the tax benefit to the property owner that bears the cost of the energy efficiency investment is the foundation upon which Congress based its adoption of Section 179D.

5.      If a governmental entity is unable to receive any benefit in exchange for an allocation of the §179D Deduction (through a rebate, a reduction in design fees or some other consideration), there is *no* incentive for the governmental property owner to make the energy efficiency investments.  This result would be contrary to the foundational basis behind Congress' adoption of Section 179D, and

would defy the basic economic incentive underpinning the tax benefit.  In order to achieve Congress' primary policy goal under Section 179D of promoting energy efficiency capital investment, the law should allow governmental property owners to share in the tax benefit by receiving value in exchange for the allocation.  Any other interpretation would be inconsistent with the clear policy goals underlying Section 179D.

6.      Since at least 2012, and continuing through today, Alliant has engaged in fraudulent practices and has violated the RICO statute against numerous governmental entities in connection with §179D deductions.  This includes the fraud against the University of Texas System and the University of Houston System which is the subject of this Complaint.  Alliant accomplished its scheme through the use of numerous fraudulent practices, including the following:  (a) Alliant always represented that the Allocation Forms were simply letters confirming that a contractor worked on a particular project.  (b) Alliant, in a clear attempt to deflect questions from government employees regarding its practices, has since 2012 falsely represented that one of its principals, Dean Zerbe, personally drafted the §179D legislation.  (c) Alliant falsely represented that both federal and state law require governmental entities to sign away valuable §179D deductions, without any compensation in return, even though Alliant has known that some governmental entities have shared the value of the §179D deductions

with designers since at least 2012.  (d) Alliant presented defective Allocation Forms to governmental entities misrepresenting that they are "true, correct, and complete" when; (i) Alliant knew the Forms failed to state the dollar amount of the §179D deduction to be transferred as required by the IRS, (ii) Alliant attempted to obtain, and did obtain, the signatures of government employees who did not have actual authority to sign them, and (iii) Alliant improperly solicited the Allocation Forms prior to the completion of the necessary energy modeling, third-party certification, and knowledge of the amount of §179D deduction.

7.     As a result of Alliant's fraud, the UT System signed away $10,017,934.00 of §179D deductions to Defendant WHR and other designers/contractors without any compensation to the taxpayers of the State of Texas.  Similarly, the UH System signed away $2,253,572.00 of §179D deductions as a result of Alliant's fraud.  And while Alliant and WHR contend that UT and UH may not legally share in the value of §179D deductions, Alliant has known of such value sharing arrangements since at least 2013, and Alliant itself worked on a project which recently resulted in a rebate to the UT System of $164,505.00 from Zimmer, Gunsul, Frasca Architects, LLP, an Alliant client.

## II.     PARTIES

8.     The University of Texas System ("UT" or "UT System") is an agency of the State of Texas and includes eight institutions of higher education and six

health institutions.  The UT System's main administrative offices are located in Austin, Texas.

9.      The University of Houston System ("UH" or "UH System") is an agency of the State of Texas, and includes four institutions of higher education. The UH System's main administrative offices are located in Houston, Texas.

10.     Defendant alliantgroup, LP ("Alliant") is a Texas limited partnership, and has its principle place of business at 3009 Post Oak Blvd., Suite 2000, Houston, Texas 77056.  Alliant has entered an appearance in this action.

11.     Defendant WHRA Merger Sub II, Inc., f/k/a WHR Architects, Inc. ("WHR") is a Texas corporation, and has its principle place of business at 1111 Louisiana St., Houston, Texas 77002.  WHR has entered an appearance in this action.

### III.   <u>JURISDICTION AND VENUE</u>

12.     This Court has original jurisdiction of this case under 18 U.S.C. § 1964 and 28 U.S.C. § 1331 because this action arises under the laws of the United States.  This action is based upon a violation of, and involves the resolution of substantial questions of federal law, specifically 18 U.S.C. § 1962 and 26 U.S.C. § 179D and related Internal Revenue Service Notices.  This Court has supplemental jurisdiction of the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV.   FACTUAL BACKGROUND

### A.   The Policy Behind Section 179D Allocations

14.     In 2005, Congress passed the Energy Policy Act, which created a tax deduction for the cost of energy-efficient commercial property. Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (Aug. 8, 2005). The deduction, codified at 26 U.S.C. § 179D, creates a valuable incentive for the construction of energy-efficient projects, with the property owner receiving a tax deduction of up to $1.80 per square foot of qualifying construction. In this way, the deduction reduces the net cost of the construction project and increases the property owner's return on investment. Thus, §179D incentivizes owners of commercial property to invest in energy-efficient construction.

15.     Congress recognized, however, that governmental entities do not pay federal income taxes like private property owners. For that reason, Congress enacted legislation to incentivize energy-efficient construction on property owned by federal, state, and local governmental entities. That legislation allows

governmental entities to allocate their §179D deductions to private "designers" that are hired for the energy-efficient construction.

16.     Section 179D(d)(4) is the special rule created for property owned by governmental entities, and authorizes those entities to allocate §179D deductions. If no value is returned to the governmental entity through a rebate or a reduction in design fees, an allocation of the §179D deduction *only* increases the designer's profit.  No rational governmental entity will make its construction decisions based on the ability to increase a private contractor's bottom line.  Section 179D(d)(4) provides:

> In the case of energy efficient commercial building property installed on or in property owned by a Federal, State, or local government or a political subdivision thereof, the Secretary [of the Treasury] shall promulgate a regulation *to allow* the allocation of the dedication to the person primarily responsible for designing the property in lieu of the owner of such property.  Such person shall be treated as the taxpayer for purposes of this section.  26 U.S.C. § 179D(d)(4) (emphasis added)

17.     The Internal Revenue Service ("IRS") has not issued regulations as directed by Congress.  However, the IRS has published Notices providing guidance on the tax deductions available under Section 179D, including I.R.S. Notice 2006-52, 2006-1 C.B. 1175, *Deduction for Energy Efficient Commercial Buildings* (June 26, 2006); I.R.S. Notice 2008-40, 2008-1 C.B. 725, *Amplification of Notice 2006-52*; *Deduction for Energy Efficient Commercial Buildings* (Apr. 7, 2008); and

I.R.S. Notice 2012-26, 2012-17 I.R.B. 847, *Modification of Notice 2008-04*; *Deduction for Energy Efficient Commercial Buildings* (Apr. 23, 2012).

18.     I.R.S. Notice 2008-40 directly relates to Section 179D(d)(4) and provides guidance on the "Special Rule for Government-Owned Buildings."  The Notice makes the allocation *discretionary* and provides, in pertinent part:

> .01 *In General*. In the case of energy efficient commercial building property (or partially qualifying commercial building property for which a deduction is allowed under § 179D) that is installed on or in property owned by a Federal, State, or local government or a political subdivision thereof, the owner of the property *may allocate* the § 179D deduction to the person primarily responsible for designing the property (the designer). If the allocation of a § 179D deduction to a designer satisfies the requirements of this section, the deduction will be allowed only to that designer.  The deduction will be allowed to the designer for the taxable year that includes the date on which the property is placed in service. *Id.* § 3.03.01. (emphasis added)

19.     This theme reappears later in the Notice where it states that the amount of the allocation is within the government's discretion.

> .06 *Tax Consequences to Designer of Government-Owned Buildings*. The maximum amount of the § 179D deduction to be allocated to the designer is the amount of the costs incurred by the owner of the government-owned building to place the energy efficient commercial building property in service.  A partial deduction *may be allocated* and computed in accordance with the procedures set forth in sections 2 and 3 of Notice 2006-52. *Id*. § 3.03.06. (emphasis added)

20.     The use of the phrases "to allow" and "may allocate", instead of "to require" and "shall allocate", expresses a clear intent that the allocation of a §179D

deduction is a discretionary action on the part of the governmental entity and not an obligatory one.

21.    In view of this discretion, it follows that any rational government entity—at least one that is a responsible steward of taxpayer funds—will seek some benefit in exchange for awarding a private entity such a substantial financial benefit.

22.    When the design contracts that are the subject of this litigation were executed and performed, the UT System and UH System fully compensated WHR for its work on the buildings. Thus, if the UT System and UH System thereafter allocate their §179D deductions to WHR without receiving consideration in return, they are simply granting WHR a windfall above and beyond the already negotiated price agreed to in the design contract.

23.    Further, it is the taxpayers, not the private designers, that pay for the costs of constructing energy-efficient buildings. Given that taxpayers are the ones paying for these additional costs, it is only fair, and required by the Texas Constitution, that they receive benefits of a deduction that is intended for those who bear those costs.

**B.    The Risk/Obligations of the Governmental Entity**

24.    A governmental entity allocating a §179D deduction is subject to a number of risks and obligations.   First, IRS Notice 2008-40 requires that the

---

government representative sign the Allocation Form under penalties of perjury. Second, the governmental entity must account for the allocations to ensure that duplicate allocations are not made to multiple designers for the same properties. Finally, although the governmental entity is not required to include any amount in income on account of a §179D allocation, the governmental entity is required to reduce the basis of the energy efficient property by the amount of the allocation.

**C.      Requirements of the 179D Allocation Form**

25.      The "designer" for purposes of Section 179D "is a person that creates the technical specifications for installation of energy efficient commercial building property (or partially qualifying commercial building property for which a deduction is allowed under § 179D)" and may include "an architect, engineer, contractor, environmental consultant or energy services provider."

26.      A designer must receive written authorization for the allocation for the government-owned building (the "Allocation Form"), and the following requirements *must* be met to satisfy the "Form of Allocation," as it is described in I.R.S. Notice 2008-40:

(1)      The name, address, and telephone number of an authorized representative of the owner of the government-owned building;

(2)      The name, address, and telephone number of an authorized representative of the designer receiving the allocation of the § 179D deduction;

(3)      The address of the government-owned building on or in which the property is installed;

(4)     The cost of the property;

(5)     The date the property is placed in service;

(6)     The amount of the § 179D deduction allocated to the designer;

(7)     The signatures of the authorized representatives of both the owner of the government-owned building and the designer or the designer's authorized representative; and

(8)     A declaration, applicable to the allocation and any accompanying documents, signed by the authorized representative of the owner of the government-owned building, in the following form:

> "Under penalties of perjury, I declare that I have examined this allocation, including accompanying documents, and to the best of my knowledge and belief, the facts presented in support of this allocation are true, correct, and complete." *Id*. § 3.04-.05.

## D.     The WHR Contract with The University of Houston System

27.     Effective September 29, 2011, The UH System and WHR executed an Owner-Architect Project Agreement concerning the University Center GMP Phase II Project ("UH University Center" and "UH University Center Agreement"). WHR was paid $5,505,699.27, the *total* amount due it pursuant to the UH University Center Agreement.   The UH University Center Agreement did not require that any tax credits or deductions be transferred to WHR by the University of Houston System.   In fact, the Agreement did not discuss allocations of the tax credits or deductions at all since they were never factored into WHR's costs.

## E.     The WHR Contracts with The University of Texas System

---

28.     Effective December 10, 2007, the UT System and JT Vaughn Construction Company, Inc. ("Vaughn") executed an Design/Build Agreement concerning the M.D. Anderson Cancer Center 1MC Building ("MD Anderson Cancer Center Building" and "M.D. Anderson Cancer Center Building Agreement").  WHR was the project architect and was paid the *total* amount due it pursuant to the M.D. Anderson Cancer Center Building Agreement.

29.     Effective December 22, 2008, the UT System and Vaughn executed an Design/Build Agreement concerning the M.D. Anderson Cancer Center Parking Facility ("MD Anderson Cancer Center Parking Facility" and "M.D. Anderson Cancer Center Parking Facility Agreement").  WHR was the project architect and was paid the *total* amount due it pursuant to the M.D. Anderson Cancer Center Parking Facility Agreement.

30.     The UT System and WHR executed an Architect's Agreement concerning the UT Health Science Center Project ("UT Health Science Center Project" and "UT Health Science Center Project Agreement").  WHR was paid the *total* amount due it pursuant to the UT Health Science Center Project Agreement.

31.     The UT System and WHR executed an Architect's Agreement concerning the UT Health Science Center-Level 4 ("UT Health Science Center-Level 4" and "UT Health Science Center-Level 4 Agreement").  WHR was paid

the *total* amount due it pursuant to the UT Health Science Center-Level 4 Agreement.

32.     None of the four UT System projects identified above (the "UT Projects") required that any tax credits or deductions be transferred to WHR by the UT System.

33.     The University of Houston Center Transformation Project and the UT Projects are collectively referred to herein as "The University Projects".

**F.     Alliant and WHR**

34.     Alliant touts itself as the nation's "premier provider of specialty tax services."  In particular, Alliant states that its mission is to strengthen American businesses by helping US companies "take full advantage of federal and state tax credits, incentives, and deductions that are available to them."  Alliant boasts that it has enabled the taking of over $1.5 Billion in §179D deductions.  Defendant WHR retained Alliant in connection with the University Projects identified above.

## V.     <u>ALLIANT'S FRAUD</u>

35.     Since at least 2012, Alliant has committed fraud against numerous governmental entities in connection with §179D deductions.  The UT System and the UH System are just two of Alliant's many victims.  The UT System and UH System have signed away $10,017,934.00 and $2,253,572.00, respectively, of §179D deductions to WHR and other designers/contractors as a result of Alliant's

---

fraud. Alliant's fraud, committed through a variety of misleading and deceptive practices, has caused Plaintiffs damages of several million dollars, with that ultimate loss suffered by Texas taxpayers.

36.     Alliant, alone and in conjunction with WHR and other designers, committed the following fraudulent acts.

a.     In deflecting questions regarding its §179D practices, Alliant has since 2012 represented to numerous governmental entities, including the UT System and UH System, that one of its principals, Dean Zerbe, personally drafted the §179D legislation. Those representations were false. As recently has August 2, 2017, Alliant held a webinar entitled "Tax Benefits for Working on Government Buildings" to discuss claiming §179D deductions on government-owned buildings. During that webinar, Alliant represented that Mr. Zerbe authored Section 179D. After being challenged about that claim, Alliant sent an email to all webinar participants on August 4, 2017 admitting that Mr. Zerbe did *not*, in fact, author the §179D provision, but rather, the "Section 179D provision passed in 2005 as part of the energy bill was thanks primarily to the efforts of Senators Snowe (R-ME) and Bingaman (D-NM) and the key Republican finance committee tax counsel responsible for the provision was Elizabeth Harris."

b.      Alliant falsely represented that both Federal and state law require governmental entities to simply sign away §179D deductions, without recovering any corresponding compensation or value, to the detriment of Plaintiffs and Texas taxpayers.  In addition, Alliant threatens government officials who won't execute Alliant's Allocation Forms by accusing such employees of breaking the law.

c.      Alliant applied pressure and engaged in deceptive practices to obtain the signatures of Plaintiffs' representatives, and representatives of other governmental entities, who had no actual authority to sign the Allocation Forms.  By way of example only:

(i)    On February 11, 2014, University of Connecticut employee Lewis Gaedt advised Alliant Government Relations Specialist Holly Schutt that he did not have authority to sign the Alliant Allocation Form. Undaunted, Ms. Schutt falsely represented to Mr. Gaedt that he did, in fact, have such authority and advised, "the fact that you are employed by the University you are absolutely entitled and are eligible to sign the allocation letter."

(ii)   On May 2, 2014, Alliant Government Relations Specialist Courtney Coad sent an email to the Los Angeles United School District ("LAUSD") requesting execution of an Allocation Form on behalf of Neubauer Electric.  This request was made after Alliant had already been advised that the LAUSD had an established process with respect to allocations, "Alliantgroup should have known better than to try to avoid the established process to get a letter signed and faxed back to them the same day that would eliminate LAUSD's benefit."

(iii)  On May 27, 2015, legal counsel for the West Des Moines Community School District sent a cease and desist letter to Alliant Government Relations Specialist Hazim Alkiswany regarding his continued contact with "various district personnel demanding they each sign the §179 energy tax allocation form."

d.     Alliant falsely represented, in both the Allocation Forms and other communications, that the Allocation Forms could be completed prior to the necessary energy modeling, third-party certification and determination

---

of the proper allocation amount in violation of Section 179D and I.R.S. Notice 2008-40.

e.      Alliant misrepresented that the Allocation Forms merely confirmed that WHR had worked on the University Projects, when Alliant well knew the Forms purported to transfer Plaintiffs' valuable Section 179D deductions to WHR.

f.      Because an Allocation Form must be executed by an authorized government representative based upon facts that are "true, correct and complete", the Allocation Form cannot be signed until: (i) the energy modeling has occurred, (ii) the building has been independently certified as energy efficient, and (iii) the amount of the allocation has been determined and included in the Allocation Form.  Nevertheless, Alliant always attempts to obtain executed Allocation Forms from governmental entities *prior to* any energy modeling of the building, any independent certification of energy efficiency, and any computation of the Section 179D deduction amount.  In addition, Alliant omits the amount of the §179D deduction from the Allocation Form so that the government employees do not realize the value of what is being signed away.

g.      Alliant misrepresented, by omission, that a transfer by Plaintiffs of Plaintiffs' Section 179D deductions would require Plaintiffs to reduce the basis of the University Projects.

## VI.    SPECIFIC ACTS OF MAIL FRAUD AND WIRE FRAUD

37.    On July 2, 2013, Alliant Government Relations Specialist Holly Schutt sent an email to UH employee Jonathan Thurston with an attached Section 179D Allocation Form prepared by Alliant relating to the University Center GMP Phase II project.  In its email, Alliant misled UH regarding the significance of the Allocation Form by representing that it was a "very simple first step for our client" and by several times referring to it as simply a "letter".  The email further misrepresented that the Allocation Form was simply being sent as a "checks and balances system" to confirm that WHR worked on the University Center GMP Phase II project.  The email further misrepresented that Section 179D was created to "help a hard hit industry in our economy", that WHR was entitled to the entire deduction, and that the UH System was *not* entitled to benefit from Section 179D. Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

38.     On July 3, 2013, UH sent an email to Alliant suggesting that UH should receive the value, or a portion of the value, of the §179D deduction that WHR was requesting relating to the University Center GMP Phase II project.  As a clear indication that the UH system did not understand the amount of the deduction involved, UH's Mr. Thurston indicated "I'm not really certain what kind of money we are talking about but [UH receiving a portion of the §179D deduction value] would seem to be an interesting topic of discussion".  Shortly after receiving that email, Alliant representative Holly Schutt falsely represented to the UH System that it could not benefit from the §179D deduction.

39.     On May 7, 2015, Alliant Senior Managing Director Rizwan Virani allegedly sent a letter to Mr. Thurston with respect to the GMP Phase II project. That letter misrepresented that Alliant and WHR had complied with the requirements of Section 179D and listed the amount of the §179D deduction as $546,768.00.  Alliant knew that §179D required that the amount of the deduction be included in the Allocation Form which was provided to UH almost two (2) years previously, and which Alliant used to induce the UH System to execute the Allocation Form.

40.     On August 6, 2013, Alliant's Holly Schutt sent another email with attached Allocation Form to Mr. Thurston regarding the Stadium Garage project.

---

Alliant's email and attached Allocation Form were fraudulent in the same respects as listed in Paragraph 37 above.

41.     On February 14, 2014, Alliant Government Relations Specialist Katie Fugnetti sent an email to Mr. Thurston regarding the Cougar Place project.  In this email, Alliant misled the UH System regarding the significance of the Allocation Form by misrepresenting that execution of the Allocation Form would be at "no cost to the district [and did not] involve any work" by UH.   Alliant further misrepresented that the Allocation Form was simply a "checks and balances measure" to verify that Page Sutherland Page ("PSP") had performed work on this project.   The email further misrepresented that PSP was entitled to the entire Section 179D Deduction, and misrepresented that the UH System was conversely not entitled to benefit or share in the value of the Section 179D deduction.  Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.   In particular, Alliant knew that the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

42.     On February 14, 2014, Alliant Government Relations Specialist Katie Fugnetti spoke with UH employee Maggie Manley regarding the Cougar Place project.  Alliant misrepresented to UH that the §179D deduction was only available

to PSP, and that the UH System could not participate in the value of the deduction. Ms. Fugnetti falsely represented that Section 179D "does not reward the building owner".

43.     On February 25, 2014, Alliant Government Relations Specialist Katie Fugnetti sent an email and attached Allocation Form to UH employee Katherine Miller regarding the Cougar Place project.  Alliant misrepresented in the email that the attached Allocation Form was merely a "checks and balance measure" to ensure that PSP worked on the project.  Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

44.     On March 31, 2015, Alliant Director of Government Relations Ashley Gold falsely represented to the UH System that PSP was entitled to the entire §179D deduction regarding the TDECU Stadium project and that the UH System was not entitled to benefit from Section 179D.  Alliant's email included an Allocation Form which misrepresented to the UH System that it contained a "true, correct and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar

amount of the §179D deduction, but misrepresented to the UH System that it did not.

45.    On January 8, 2016, Alliant Government Relation Specialist Sarah Marks had a telephone conversation with UH employee Trent Williams regarding the UH Health and Biomedical Science Center II project.  That same day, Ms. Marks sent an email to Mr. Williams.  In those communications, Alliant misrepresented that Tellepsen was entitled to the entire §179D deduction and that the UH System was not entitled to benefit from §179D.  Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

46.    On January 21, 2014, Alliant Government Relations Specialist Holly Schutt sent an email to UH employee Jonathan Thurston with an attached Allocation Form prepared by Alliant relating to the UH Central Plant project.  In its email, Alliant misled UH regarding the significance of the Allocation Form by several times referring to it as simply a "letter".  The email further misrepresented that the Allocation Form was simply being sent as a "checks and balance system" to confirm that Vaughn Construction ("Vaughn") worked on the UH Central Plant

project.  The email further misrepresented that Section 179D was created to "help a hard hit industry in our economy", that Vaughn was entitled to the entire §179D deduction, and that the UH System was *not* entitled to benefit from §179D.  Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

47.    On February 12, 2016, Alliant Government Relations Specialist Sarah Marks sent an email to UH employee Joujou Zebdaoui regarding the Energy Research Park Building 1A project.  In its email, Alliant misrepresented that Shah Smith & Associates ("SS&A") was entitled to the entire §179D deduction and that the UH System was not entitled to benefit from §179D.  Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

48.    On August 9, 2013, Alliant Government Relations Specialist Cassandra Turner sent an email with attached Allocation Form prepared by Alliant

relating to the Jaguar Suites project.  In its email, Alliant misled UH regarding the significance of the Allocation Form by representing that it was a "very simple first step for our client" and by diminishing the importance of the Allocation Form by several times referring to it as simply a "letter".  The email further misrepresented that the Allocation Form was simply being sent as a "checks and balance system" to confirm that Smith & Company ("Smith") worked on the Jaguar Suites project.  The email further misrepresented that Section 179D was created to "help a hard hit industry in our economy", that Smith was entitled to the entire §179D deduction, and that the UH System was *not* entitled to benefit from §179D.  Alliant prepared the Allocation Form and misrepresented to the UH System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

49.   On August 15, 2013, Alliant Government Relations Specialist Cassandra Turner sent an email with a form letter authored by Alliant Group National Managing Director Dean Zerbe and Alliant Group Vice President Mark W. Iverson dated March 10, 2012.  Alliant, in a clear attempt to bolster the validity of its fraudulent Section 179D practices, represented that Dean Zerbe was a former United States Senator and that Mr. Zerbe co-authored Section 179D.  Both of those

statements were false.  Alliant's attached form letter falsely represented that there were no rules or other restrictions as to which government employee could sign the Allocation Form, when Alliant knew and understood that state statutes and constitutional provisions limit who may execute such Allocations Forms.

50.     On or about August 16, 2013, Alliant Government Relations Specialist Cassandra Turner falsely represented to UH employee John Posch that Smith & Company was entitled to the entire §179D deduction regarding the Jaguar Suites project, and that the UH System was not entitled to benefit from Section 179D.

51.     On January 21, 2014, Alliant Government Relations Specialist Holly Schutt sent an email with attached Allocation Form to UH employee Kelly Buehler.  Alliant's email and attached Allocation Form were fraudulent in the same respect as listed in Paragraph 37 above.

52.     On July 3, 2013, Alliant Government Relations Specialist Holly Schutt sent an email to UT employee Lawrence Kubacak with an attached Section 179D Allocation Form prepared by Alliant relating to the MD Anderson Cancer Center project.  In its email, Alliant misled UT regarding the significance of the Allocation Form by representing that it was a "very simple first step for our client" and by diminishing the importance of the Allocation Form by several times referring to it as simply a "letter".  The email further misrepresented that the

Allocation Form was simply being sent as a "checks and balances system" to confirm that WHR worked on the MD Anderson Cancer Center project. The email further misrepresented that Section 179D was created to "help a hard hit industry in our economy", that WHR was entitled to the entire §179D deduction, and that the UH System was *not* entitled to benefit from §179D. Alliant prepared the Allocation Form and misrepresented to the UT System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service. In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UT System that it did not.

53.     On July 15, 2013, Alliant's Holly Schutt sent an email with attached Allocation Form to UT Employee William Stewart regarding the UT HSC project. Alliant's email and attached Allocation Form were fraudulent in the same respects as listed in Paragraph 37 above.

54.     On December 13, 2013, Alliant Government Relations Specialist Holly Schutt sent an email to UT employee Dayle Pettus regarding the UTD Parking Structure project. In this email, Alliant misled the UT System regarding the significance of the Allocation Form by misrepresenting that the Allocation Form was simply a "checks and balance measure" to verify that Vaughn had performed work on this project. The email further misrepresented that Vaughn

was entitled to the entire §179D deduction, and misrepresented that the UT System was conversely not entitled to benefit or share in the value of the §179D deduction. Alliant prepared the Allocation Form and misrepresented to the UT System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew that the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UT System that it did not.

55.    On December 13, 2013, Alliant's Holly Schutt sent a second email to Mr. Pettus with attached Position Paper and demand for §179D allocation.  In the Position Paper, Alliant falsely represented that UT was obligated to make the allocation to Vaughn under both Federal and State law.  By this time, however, Alliant was aware of other instances in which governmental entities had shared in the value of §179D Deductions.

56.    On July 15, 2013, Alliant Government Relations Specialist Jennifer Marilley sent an email and attached Allocation Form to UT employee Vince Yauger regarding a number of UTD projects.  Alliant misrepresented in the email that the attached Allocation Form was merely a "checks and balance measure" to ensure that Hill & Wilkenson ("H&W") worked on the projects.  Alliant prepared the Allocation Form and misrepresented to the UT System that it contained a "true, correct, and complete" statement of facts as required by the Internal Revenue

Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

57.     On March 31, 2015, Alliant Government Relations Specialist Holly Schutt falsely represented to the UT System that Spaw Glass was entitled to the entire §179D deduction regarding the UT Southwest Medical projects and that the UT System was not entitled to benefit from §179D.  Alliant's email included an Allocation Form which misrepresented to the UT System that it contained a "true, correct and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

58.     On March 9, 2016, Alliant Government Specialist Sarah Marks falsely represented to the UH System that seeking to receive value in exchange for a §179D allocation was "illegal."

59.     On June 13, 2013, Alliant Senior Associate Director Jennifer Marilley falsely represented to Boston Housing Authority employee Dan Helmes that JM Electrical was entitled to the entire §179D deduction regarding various Boston Housing projects and that Boston Housing was not entitled to benefit from §179D. Ms. Marilley also falsely represented that the principals at Alliant "helped or

actually drafted the §179D rule."   Alliant's email included an Allocation Form which misrepresented to Boston Housing that it contained a "true, correct and complete" statement of facts as required by the Internal Revenue Service.   In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to Boston Housing that it did not.

## VII.   THE ALLOCATION FORMS ARE VOID

60.    Only persons having actual authority to act on behalf of the State of Texas, granted by the Constitution or statute, can bind the State.  *State ex rel. Dept. of Criminal Justice v. VitaPro Foods, Inc.*, 8 S.W.3d 316, 322 (Tex. 1999). Because none of the signatories to the Allocation Forms in this case had actual authority to execute them, the Allocation Forms are *void ab initio*.

61.    The Allocation Forms prepared by Defendants were in violation of Section 179D and IRS Notice 2008-40, and as a result, are illegal and void. *Mayfield v. Troutman*, 613 S.W.2d 339, 344 (Tex. Civ. App.—Tyler 1981, write ref'd n.r.e.)

62.    In addition, the §179D deductions could have been allocated to other "designers" including Vaughn, Shah Smith, Tellepsen and Affiliated Engineers.

## VIII.  TEXAS GOVERNMENT CODE 447.004(b-3). AS INTERPRETED BY DEFENDANTS, IS UNCONSTITUTIONAL AND IS PREEMPTED BY 26 U.S.C. § 179D

63.    The Texas Constitution prohibits the granting of public funds, property or contract rights to any individuals, associations or corporations without a corresponding receipt of "adequate consideration".  No additional consideration was paid by Defendants to Plaintiffs in exchange for the allocation of Section 179D deductions.  As no value was given by Defendants, the Allocation Forms are illegal and *void ab initio*.

64.    Alliant has claimed that Texas Government Code 447.004(b-3) requires state agencies to execute §179D Allocation Forms.  However, any mandate to allocate §179D deductions, without "adequate consideration" in return, violates Article III, Sections 44, 51 and 52 of the Texas Constitution, and is thus unconstitutional.

65.    Finally, I.R.S. Notice 2008-40 expressly provides that the allocation of Section 179D deductions is permissive, and preempts Texas Government Code 447.004(b-3) to the extent the Texas statute is construed to require mandatory allocations.

## COUNT ONE – 18 U.S.C. § 1962(c)

### Enterprises Operated and Managed by Alliant

66.     This claim is brought against Defendant Alliant only, and Plaintiffs reallege the facts stated in paragraphs 1-65 above as if set forth specifically herein.

67.     WHR, PSP, Vaughn, SS&A, Smith, and H&W constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Client Enterprise").

a.      WHR, PSP, Vaughn, SS&A, Smith, and H&W share the common purpose of (among other things) collaborating with Alliant to secure tax benefits and, in particular, share the common purpose of fraudulently inducing governmental entity building owners, such as UT and UH, to allocate 179D Deductions to members of the Client Enterprise.

b.      WHR, PSP, Vaughn, SS&A, Smith, and H&W are related in that they are all clients of Alliant and/or have all been contractors on UT and UH building projects.

c.      The Client Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Client Enterprise has operated since shortly after the passage of the Energy Policy Act of 2005, continues to operate, and, under the direction of Alliant, has fraudulently obtained millions of dollars worth of 179D Deductions from UT and UH,

and continues to fraudulently induce other governmental entity building owners to allocate 179D deductions to members of the Client Enterprise.

Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of the Client Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-58).

68.     In the alternative, or in addition to paragraph 67, persons belonging to the UT Office of Facilities Planning / Construction (i.e., Lawrence Kubacak, William Stewart, Dayle Pettus, and Vince Yauger) constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "UTOFPC Enterprise").

a.     Lawrence Kubacak, William Stewart, Dayle Pettus, and Vince Yauger share the common purpose of (among other things) coordinating and overseeing the activities of the various contractors who are hired to design and construct buildings for UT.

b.     Lawrence Kubacak, William Stewart, Dayle Pettus, and Vince Yauger are related in that they are all employed in UT Office of Facilities Planning / Construction.

c.     The UTOFPC Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the UTOFPC Enterprise has overseen the successful construction of numerous UT buildings.

Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducted, participated in, engaged in, and operated and managed the affairs of UTOFPC Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59), which enabled Alliant (on behalf of its clients) to fraudulently obtain unauthorized and invalid 179D Deduction Allocation Forms from the UT Office of Facilities Planning / Construction.

69.    In the alternative, or in addition to paragraph 66-68, persons belonging to the UH Office of Facilities Planning / Construction (i.e., Jonathan Thurston, Maggie Manley, Katherine Miller, Trent Williams, Joujou Zebdaoui, John Posch, and Kelly Buehler) constituted an "enterprise," within the meaning of

18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "UHOFPC Enterprise").

a.     Jonathan Thurston, Maggie Manley, Katherine Miller, Trent Williams, Joujou Zebdaoui, John Posch, and Kelly Buehler share the common purpose of (among other things) coordinating and overseeing the activities of the various contractors who hired to design and construct buildings for UH.

b.     Jonathan Thurston, Maggie Manley, Katherine Miller, Trent Williams, Joujou Zebdaoui, John Posch, and Kelly Buehler are related in that they are all employed in UH Office of Facilities Planning / Construction.

c.     The UHOFPC Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the UHOFPC Enterprise has overseen the successful construction of numerous UH buildings.

Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducted, participated in, engaged in, and operated and managed the affairs of UTOFPC Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59), which enabled Alliant (on

behalf of its clients) to fraudulently obtain unauthorized and invalid 179D deduction allocation forms from the UH Office of Facilities Planning / Construction.

70.     In the alternative to paragraphs 66-69, WHR, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of WHR through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59).

71.     In the alternative to paragraphs 66-70, PSP, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of PSP through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59).

72.    In the alternative to paragraphs 66-71, Vaughn, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of Vaughn through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59).

73.    In the alternative to paragraphs 66-72, SS&A, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of SS&A through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59).

74.    In the alternative to paragraphs 66-73, Smith, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages

the affairs of PSP through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59).

75.    In the alternative to paragraphs 66-74, H&W, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of H&W through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud (described, *supra*, in paragraphs 35-59).

76.    At all relevant times, the enterprises alleged in paragraphs 66-75 were engaged in, and their activities affected, interstate commerce and foreign commerce.

### (Pattern of Racketeering Activity)

77.    All of the acts of racketeering described in paragraphs 35 through 59 were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud UT or UH of the value of their §179D deductions, their common result was to defraud UT or UH

of the value of their §179D deductions; Alliant, through its agents or clients, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; UT or UH were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

78.    All of the acts of racketeering described in paragraphs 35 through 59 were continuous so as to form a pattern of racketeering activity in that Alliant engaged in the acts of racketeering (described, *supra*, in paragraphs 35-59) from July 2013 through February 2016 (at a minimum) and/or the acts of racketeering threaten to continue indefinitely against other governmental entity building owners as the acts of racketeering are the regular way in which Alliant does business. Alliant's acts of racketeering against UT and UH stopped only after UH and UT discovered Alliant's scheme to defraud and took action to protect themselves.

### (Causation / Damages)

79.    As a direct and proximate result of, and by reason of, the activities of Alliant, and its conduct in violation of 18 U.S.C. § 1962(c), UT and UH were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). The UH System Allocation Form to WHR was signed by Jonathon Thurston.  The UT System Allocation Forms were signed by William Stewart and Lawrence Kubacak.  The UT and UH employees who executed the Allocations Forms to

---

WHR, and Alliant's other clients, justifiably relied on the misrepresentations set forth in paragraphs 35-59, *supra*.  UT and UH suffered damages because they were fraudulently induced to allocate §179D deductions to Alliant's clients without receiving adequate value in return.  UT and UH are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT TWO – DECLARATORY JUDGMENT

80.     Plaintiffs bring this claim against both Defendants, and Plaintiffs reallege the facts stated in 1-79 above as if set forth specifically herein.

81.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Plaintiffs seek a declaration of the rights and legal relations of the parties in connection with the above described transactions including the validity of the Allocation Forms described above.

82.     Plaintiffs request this Court to enter declaratory judgment that:

a.     Article III, Sections 44, 51 and 52 of the Texas Constitution prohibit Plaintiffs from making a grant of public funds, property or contract rights to any individuals, associations or corporations without a corresponding receipt of adequate compensation.

b.      Tex. Gov. Code 447.004(b-3) does not require the State of Texas or any of its agencies, including public universities, to allocate Section 179D deductions to any private person or entity.

c.      Tex. Gov. Code 447.004(b-3) does not require the State of Texas or any of its agencies, including public universities, to allocate Section 179D deductions to any private person or entity unless it receives adequate compensation in return.

d.      Tex. Gov. Code 447.004(b-3), to the extent it mandates the allocation of Section 179D deductions by the State of Texas or any of its agencies, including public universities, without adequate compensation in return, is unconstitutional in violation of Art. III, Sections 44, 51 and 52 of the Texas Constitution.

e.      Texas Government Code § 447.004(b-3), to the extent it requires governmental entities to allocate § 179D deductions, is preempted by 26 U.S.C. § 179D, and the IRS Notices and Memoranda regarding § 179D.

f.      The allocation of its §179D deductions by the University of Houston System to WHR, dated July 3, 2013, regarding Transformation GMP Phase II project, is *void ab initio* because of a lack of adequate

compensation paid to the University of Houston System in return for the allocation.

g.     The allocation of its §179D deductions by the University of Texas System to WHR, dated July 10, 2013, regarding the MD Anderson Cancer Center 1 MC Building project and MD Anderson Cancer Center Mid Campus Parking project, is *void ab initio* because of a lack of adequate compensation paid to the University of Texas System in return for the allocation.

h.     The allocation of its §179D deductions by the University of Texas System to WHR, dated July 15, 2013, regarding the UT HSC Phases I & II project and the UT HSC Level 4 project, is *void ab initio* because of a lack of adequate compensation paid to the University of Texas System in return for the allocation.

i.     The university employees who executed Allocation Forms to WHR did not have the actual authority to execute those forms.

j.     The allocation of its §179D deductions by the University of Houston System to WHR, dated July 3, 2013, regarding Transformation GMP Phase II project is *void ab initio* because the employee signing on behalf of the University of Houston System did not have actual authority to execute the Allocation Form.

k.      The allocation of its §179D deductions by the University of Texas System to WHR, dated July 10, 2013, regarding the MD Anderson Cancer Center 1 MC Building project and MD Anderson Cancer Center Mid Campus Parking project is *void ab initio* because the employee signing on behalf of the University of Texas System did not have actual authority to execute the Allocation Form.

l.      The allocation of its §179D deductions by the University of Texas System to WHR, dated July 15, 2013, regarding the UT HSC Phases I & II project and the UT HSC Level 4 project, is *void ab initio* because the employee signing on behalf of the University of Texas System did not have actual authority to execute the Allocation Form.

m.      26 U.S.C. § 179D, and the IRS Notices and Memoranda regarding § 179D, mandate that the allocation of § 179D deductions by governmental entities is permissive, not mandatory.

n.      The Allocation Forms presented by Defendants to Plaintiffs failed to state the amount of the § 179D deductions, in violation of Section 179D and I.R.S. Notice 2008-40.

o.      The Allocation Forms presented by Defendants to Plaintiffs failed to set forth facts which were "true, correct, and complete" in violation of Section 179D and I.R.S. Notice 2008-40.

## <u>COUNT THREE – FRAUD AND MISREPRESENTATION</u>

83.     This Count is against Defendant Alliant only, and Plaintiffs reallege the facts stated in paragraphs 1-82 above as if set forth specifically herein.

84.     Alliant, on behalf of itself and its client WHR, misrepresented to Plaintiffs that: (i) the proffered Allocation Forms were compliant with §179D and the applicable I.R.S. Notices; (ii) the Allocation Forms set forth all information required by the I.R.S. Code and I.R.S. Notices, and that the facts set forth therein were "true, correct, and complete;" (iii) the Allocation Forms "just ensure that an energy service provider did actually participate in the construction and the improvements of the project" when Defendants knew that the Allocation Forms purported to transfer Plaintiffs' Section 179D deductions and would be used by WHR when filing its tax returns to claim substantial tax deductions and to enrich Alliant; (iv) the Allocation Forms could be completed prior to the necessary energy modeling, third-party certification and the determination of the proper § 179D deduction amount; and (v) Plaintiffs were legally required to execute the Allocation Forms transferring deductions to WHR and Alliant's other contractor clients.  The specific misrepresentations are set forth in paragraphs 35-58, *supra*.

85.     Defendants' representations as set forth above were material.  Further, Defendants either knew the representations were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth.

---

Defendants made the representations with the intent that Plaintiffs rely on them, and Plaintiffs did in fact rely on the representations among other things, executing the Allocation Forms to transfer §179D deductions to WHR and Alliant's other clients, without receiving adequate consideration in return.   Such misrepresentations caused Plaintiffs damage.   As a result, Plaintiffs are entitled to recover their actual damages, exemplary damages, restitution, pre- and post-judgment interest, and attorney's fees and costs.

## COUNT FOUR – UNJUST ENRICHMENT

86.     This claim is brought against both Defendants, and Plaintiffs reallege the facts stated in paragraph 1-85 above as if set forth specifically herein.

87.     The Allocation Forms identified above are *void ab initio*, and were obtained from Plaintiffs by fraud, taking undue advantage, and/or mutual mistake. Therefore, Plaintiffs are entitled to recover from Defendants all benefits they received by use of the void Allocation Forms.   The financial benefits received by Defendants exceed $1,621,000.

## PRAYER

Plaintiffs request that their declaratory judgment against Defendants be granted, that Plaintiffs recover their actual damages, treble damages, restitution,

---

recoupment of Defendants' unjust enrichment, exemplary damages, pre- and post-judgment interest, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Michael E. McCue
Michael E. McCue
State Bar No. 13494150
Alex J. Pilawski
State Bar No. 24074899
Matt L. Roberts
State Bar No. 24098330
Meadows, Collier, Reed, Cousins,
   Crouch & Ungerman, LLP
901 Main St., Suite 3700
Dallas, TX 75202
Telephone:            214-744-3700
Facsimile:214-747-3732
mmccue@meadowscollier.com
apilawski@meadowscollier.com

ATTORNEYS FOR PLAINTIFFS
THE UNIVERSITY OF TEXAS
SYSTEM AND THE UNIVERSITY
OF HOUSTON SYSTEM