UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE UNIVERSITY OF TEXAS SYSTEM and THE UNIVERSITY OF HOUSTON SYSTEM, | § § § § | |
| Plaintiffs, | § § | Civil Action No. 4:17-cv-02588 |
| v. | § § | |
| ALLIANTGROUP, LP and WHRA MERGER SUB II, INC. n/k/a WHR ARCHITECTS, INC., | § § § | |
| Defendants. | § | |

## SECOND AMENDED COMPLAINT

COME NOW The University of Texas System ("UT System") and The University of Houston System ("UH System") (collectively "Plaintiffs" or "Universities"), and file this action against Defendants alliantgroup, LP ("Alliant") and WHRA Merger Sub II, Inc. n/k/a WHR Architects, Inc. ("WHR"), showing to the Court as follows:

## I.      INTRODUCTION

1.      This Complaint involves a nationwide scheme by Alliant, alone and on behalf of numerous contractors, to wrongfully obtain valuable Section 179D tax deductions ("§179D deduction") from hundreds of governmental entities without paying any compensation.  This scheme costs taxpayers millions of dollars—every

year—by providing a windfall to private companies which do not provide *any* additional work or value to the governmental entities in exchange for the §179D allocations.

2.      In 2005, Congress passed a law to encourage the construction of energy-efficient buildings by providing tax deductions to the buildings' owners. For buildings constructed by governmental entities (which typically do not pay federal income taxes), the law allows the governmental entities to "allocate"—in other words, assign—the governmental entities' §179D deductions to private companies that "design" the energy-efficient buildings.

3.      There is no federal legislation or case law that prohibits a governmental entity from receiving value in return for an allocation of a §179D deduction.   In fact, the framework and legislative intent of §179D supports a governmental entity's right to receive value in exchange for the allocation.

4.      Since at least 2012, and continuing through today, Alliant has engaged in deceptive and fraudulent practices against numerous governmental entities in connection with §179D deductions, including the UT System and the UH System. Alliant accomplished its scheme through the use of numerous deceptive and fraudulent practices, including the following:  (a) Alliant, in a clear attempt to deflect questions from government employees regarding its practices, has since 2012 falsely represented that one of its principals, Dean Zerbe, personally drafted

the §179D legislation.  (b) Alliant falsely represented that both federal and state law *required* governmental entities to sign away valuable §179D deductions, without any compensation in return, even though Alliant has known that the allocations are not mandatory and that some governmental entities have shared the value of the §179D deductions with designers since at least 2012.  (c) Alliant presented defective Allocation Forms to governmental entities misrepresenting that they are "true, correct, and complete" when; (i) Alliant knew the Forms failed to state the dollar amount of the §179D deduction to be transferred as required by the IRS, (ii) Alliant attempted to obtain, and did obtain, the signatures of government employees who did not have "actual authority" to sign them, and (iii) Alliant improperly solicited the Allocation Forms prior to the completion of the necessary energy modeling, third-party certification, and determination of the amount of §179D deduction.

5.      As a result of Alliant's fraud and deceptive practices, the UT System signed away $10,171,199.00 of its §179D deductions to Defendant WHR and other Alliant clients without any compensation to the taxpayers of the State of Texas. Similarly, the UH System signed away $2,570,196.00 of its §179D deductions as a result of Alliant's fraudulent and deceptive practices.  And while Alliant and WHR contend that the Universities may not legally monetize the allocation of their §179D deductions, Alliant has known of such value sharing arrangements since at

least 2012.  Alliant itself was involved in an allocation of a §179D deduction from the UT System to Zimmer, Gunsul, Frasca Architects, LLP, an Alliant client, which resulted in a rebate to the UT System of $164,505.00.

6.      Plaintiffs also bring an action pursuant to the Declaratory Judgment Act to declare invalid five (5) §179D allocations by the UT System and UH System to Defendant WHR.

## II.   <u>PARTIES</u>

7.      The University of Texas System is an agency of the State of Texas and includes eight institutions of higher education and six health institutions.  The UT System's main administrative offices are located in Austin, Texas.

8.      The University of Houston System is an agency of the State of Texas, and includes four institutions of higher education.   The UH System's main administrative offices are located in Houston, Texas.

9.      Defendant alliantgroup, LP is a Texas limited partnership, and has its principle place of business at 3009 Post Oak Blvd., Suite 2000, Houston, Texas 77056.  Alliant has numerous other offices throughout the United States.  Alliant touts itself as the nation's "premier provider of specialty tax services."   In particular, Alliant states that its mission is to strengthen American businesses by helping US companies "take full advantage of federal and state tax credits, incentives, and deductions that are available to them."   Alliant boasts that it has

enabled the taking of over $1.5 Billion in §179D deductions.  Alliant has entered an appearance in this action.

10.     Defendant WHRA Merger Sub II, Inc., n/k/a WHR Architects, Inc. is a Texas corporation, and has its principle place of business at 1111 Louisiana St., Houston, Texas 77002.  WHR has entered an appearance in this action.

### III.   <u>JURISDICTION AND VENUE</u>

11.     This Court has original jurisdiction of this case under 18 U.S.C. § 1964 and 28 U.S.C. § 1331 because this action arises under the laws of the United States.  This action is based upon a violation of, and involves the resolution of substantial questions of federal law, specifically 18 U.S.C. § 1962 and 26 U.S.C. § 179D and related Internal Revenue Service Notices.  This Court has supplemental jurisdiction of the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

### IV.   <u>FACTUAL ALLEGATIONS</u>

**A.     The Policy Behind Section 179D Allocations**

13.     In 2005, Congress passed the Energy Policy Act, which created a tax deduction for the cost of energy-efficient commercial property. Energy Policy Act

of 2005, Pub. L. No. 109-58, 119 Stat. 594 (Aug. 8, 2005). The deduction, codified at 26 U.S.C. § 179D, creates a valuable incentive for the construction of energy-efficient projects, with the property owner receiving a tax deduction of up to $1.80 per square foot of qualifying construction. In this way, the §179D deduction incentivizes owners of property to invest in energy-efficient construction, and reduces the net cost of the construction project.

14.     Congress recognized, however, that governmental entities typically do not pay federal income taxes like private property owners. For that reason, Congress enacted legislation to incentivize energy-efficient construction on property owned by federal, state, and local governmental entities. That legislation *allows*, but does not mandate, governmental entities to allocate their §179D deductions to private "designers" that design energy-efficient buildings and systems.

15.     Section 179D(d)(4) is the special rule created for property owned by governmental entities, and allows those entities to allocate §179D deductions.  If no value is returned to the governmental entity through a rebate or a reduction in design fees, an allocation of the §179D deduction *only* increases the designer's profit and provides *no* incentive for the governmental entity to construct energy efficient buildings.  Section 179D(d)(4) provides:

> In the case of energy efficient commercial building property installed on or in property owned by a Federal, State, or local government or a

political subdivision thereof, the Secretary [of the Treasury] shall promulgate a regulation *to allow* the allocation of the dedication to the person primarily responsible for designing the property in lieu of the owner of such property.  Such person shall be treated as the taxpayer for purposes of this section.  26 U.S.C. § 179D(d)(4) (emphasis added)

16.    The Internal Revenue Service ("IRS") has not issued regulations as directed by Congress.[1]

17.    I.R.S. Notice 2008-40 directly relates to Section 179D(d)(4) and provides guidance on the "Special Rule for Government-Owned Buildings."  The Notice makes the allocation *discretionary* and provides, in pertinent part:

.01 *In General*. In the case of energy efficient commercial building property (or partially qualifying commercial building property for which a deduction is allowed under § 179D) that is installed on or in property owned by a Federal, State, or local government or a political subdivision thereof, the owner of the property *may allocate* the § 179D deduction to the person primarily responsible for designing the property (the designer). If the allocation of a § 179D deduction to a designer satisfies the requirements of this section, the deduction will be allowed only to that designer.  The deduction will be allowed to the designer for the taxable year that includes the date on which the property is placed in service.  *Id.* § 3.03.01. (emphasis added)[2]

---

[1] The IRS has published Notices providing guidance on the tax deductions available under Section 179D, including I.R.S. Notice 2006-52, 2006-1 C.B. 1175, Deduction for Energy Efficient Commercial Buildings (June 26, 2006); I.R.S. Notice 2008-40, 2008-1 C.B. 725, Amplification of Notice 2006-52; Deduction for Energy Efficient Commercial Buildings (Apr. 7, 2008); and I.R.S. Notice 2012-26, 2012-17 I.R.B. 847, Modification of Notice 2008-04; Deduction for Energy Efficient Commercial Buildings (Apr. 23, 2012).

[2] This theme reappears later in the Notice where it states that the amount of the allocation is within the government's discretion. 06 Tax Consequences to Designer of Government-Owned Buildings.  The maximum amount of the § 179D deduction to be allocated to the designer is the amount of the costs incurred by the owner of the government-owned building to place the energy efficient commercial building property in service.  A partial deduction may be allocated and computed in accordance with the procedures set forth in sections 2 and 3 of Notice 2006-52.  Id. § 3.03.06. (emphasis added)

---

18.    The use of the phrases "to allow" and "may allocate", instead of "to require" and "shall allocate", expresses a clear intent that the allocation of a §179D deduction is a discretionary action on the part of the governmental entity and is not mandatory.

**B.    The Risk/Obligations of the Governmental Entity**

19.    A governmental entity allocating a §179D deduction is subject to a number of obligations.  First, IRS Notice 2008-40 requires that the government representative sign the Allocation Form under penalties of perjury.  Second, the governmental entity must account for the allocations to ensure that duplicate allocations are not made to multiple designers for the same properties.  Finally, the governmental entity must reduce the basis of the energy efficient property by the amount of the §179D deduction.

**C.    Requirements of the Section 179D Allocation Form**

20.    The "designer" for purposes of §179D "is a person that creates the technical specifications for installation of energy efficient commercial building property (or partially qualifying commercial building property for which a deduction is allowed under § 179D)" and may include "an architect, engineer, contractor, environmental consultant or energy services provider."  A company which simply installs or constructs the energy efficient property or system(s) does not qualify as a designer.

21.   A designer must receive written authorization for the allocation for the government-owned building (the "Allocation Form"), which *must* set forth, among other information, the "amount of the § 179D deduction allocated to the designer." IRS Notice 2008-40.

**D.   WHR Contracts with The University of Houston System**

22.   The UH System and WHR executed two (2) Owner-Architect Project Agreements, the first for the UH Center Transformation Phase II project and the second for the UH Stadium Garage project (the "UH-WHR Projects").   Neither agreement required the UH System to allocate §179D deductions to WHR.

**E.   WHR Contracts with The University of Texas System**

23.   The UT System and JT Vaughn Construction Company, Inc. ("Vaughn") executed two (2) Design/Build Agreements, the first for the M.D. Anderson Cancer Center 1MC Building project and the second for the M.D. Anderson Cancer Center Parking Facility.   WHR was the architect on both projects pursuant to its sub-contracts with Vaughn.

24.   The UT System and WHR also executed two (2) Architect's Agreements, the first for the UT Health Science Center project and the second for the UT Health Science Center-Level 4 project.

25.     None of these four (4) UT System contracts identified above (the "UT-WHR Projects") required the UT System to allocate any Section 179D deductions to WHR.

26.     WHR, in sworn deposition testimony, has admitted that the UT System and UH System fully compensated WHR for its design work on the building projects in question before the allocation of §179D deductions.  WHR has further admitted that WHR paid *no* compensation to the UT System or UH System in exchange for the Universities' five (5) allocations of §179D deductions. Thus, the Universities' allocation of their §179D deductions to WHR, without receiving *any* consideration in return, simply bestowed WHR with a windfall above and beyond the already negotiated price agreed to in the design contracts.  The four (4) Allocation Forms regarding the WHR projects are attached hereto as Exhibit 3.

## F.     The UT System Section 179D Allocations to Alliant Clients

27.     Alliant wrongfully obtained twenty-six (26) §179D allocations from the UT System for the following Alliant clients: WHR, Bartlett Cocke General Contractors ("Bartlett Cocke"), Dynamic Systems, Inc. ("Dynamic"), Hill & Wilkinson, Ltd. ("H&W"), Jacobs Engineering Group, Inc. ("Jacobs"), JMEG, LP ("JMEG"), Page Southerland Page ("PSP"), Shaw Smith & Associates, Inc. ("Shaw"), SpawGlass Employee Holdings, Co. ("SpawGlass"), SW Associates Consulting Engineers, Inc. ("SWA"), Trinity MEP Engineering ("Trinity") and

Vaughn Construction ("Vaughn").  The specifics of those allocations have been stipulated to by the parties in Exhibit 1 filed under seal, and Exhibit 2 attached hereto.

**G.     The UH System Section 179D Allocations to Alliant Clients**

28.     Alliant wrongfully obtained eight (8) Section 179D allocations from the UH System for the following Alliant clients: WHR, PSP, Vaughn, Tellepsen ("Tellepsen"), and Hoar Construction ("Hoar").  The specifics of those allocations have been stipulated to by the parties in Exhibit 1 filed under seal, and Exhibit 2 attached hereto.

**H.     The Texas Constitution Prohibits the Allocation of Section 179D Deductions Without a Corresponding Receipt of "Adequate Consideration"**

29.     The Texas Constitution prohibits the granting of public funds, property or contract rights to any individuals, associations or corporations without a corresponding receipt of "adequate consideration".  Texas Constitution, Article III, Sections 44, 51 and 52.

30.     WHR has admitted in sworn testimony that it paid *no* consideration to the UT System or UH System in exchange for the five (5) allocations of §179D deductions.  As no value was given by WHR, the Allocation Forms are illegal and void.

31.     Defendants have claimed that Texas Government Code § 447.004(b-3) *requires* state agencies to execute §179D Allocation Forms.   However, any legislation mandating the allocation of §179D deductions, without "adequate consideration" in return, violates Article III, Sections 44, 51 and 52 of the Texas Constitution, and is thus unconstitutional.

**I.     Texas Government Code § 447.004(b-3) is Preempted by Section 179D**

32.     Section 179D and IRS Notice 2008-40 provide that the allocation of §179D deductions is permissive, and preempts Texas Government Code 447.004(b-3) to the extent the Texas statute is construed to require mandatory allocations.

**J.     The Allocation Forms to WHR are Void Because The University Employees Had No "Actual Authority" To Sign Them**

33.     Only persons having actual authority to act on behalf of the State of Texas, granted by the Constitution or statute, can bind the State.   *State ex rel. Dept. of Criminal Justice v. VitaPro Foods, Inc.*, 8 S.W.3d 316, 322 (Tex. 1999).   None of the signatories to the Allocation Forms identified in Exhibits 1 and 2 had "actual authority" to execute them.

34.     The UT System and UH System employees who signed the four (4) Allocation Forms to WHR are Jonathan Thurston, Wes Stewart and Lawrence Kubacak.   Those employees did not have the "actual authority" to sign the Allocation Forms for two separate reasons.  First, all of the signers were employed

---

in the Universities' Planning and Construction Departments.  As a result, although they had some authority to sign construction related documents up to a certain dollar amount, they had *no* authority to execute an assignment of the Universities' §179D tax deductions, or any other tax related documents.  Second, both the UT System and UH System have Board of Regents policies which limit signatory authority for their employees to specific dollar amounts.  None of the three University employees identified above who signed the §179D Allocation Forms had the delegated authority to execute allocations in the amounts of the §179D deductions allocated to WHR.  As a result, the allocation of the Universities' §179D deductions to WHR are *void ab initio*.

**K.  Alliant's Fraudulent and Deceptive Practices Supporting Plaintiffs' Fraud and RICO Claims**

35.    Since at least 2012, Alliant has utilized fraudulent and deceptive practices against governmental entities to obtain §179D deductions for its clients. The UT Sysem and the UH System are just two of Alliant's many victims.  As a result of Alliant's fraud, the UT System and the UH System have signed away $10,171,199.00 and $2,570,196.00, respectively, of §179D deductions to WHR and Alliant's other clients.   Alliant's fraud, committed through a variety of misleading and deceptive practices, has caused Plaintiffs damages of several million dollars, with that loss ultimately suffered by Texas taxpayers.

36.     Alliant's fraudulent and deceptive practices were designed, alone and in combination, to convince the UT System and UH System (a) that the Universities were being asked to undertake a simple and insignificant ministerial act, (b) that the Universities' §179D deductions had no value to the Universities and could not be monetized by the Universities, (c) that Alliant had already properly determined the "designer" for each University project, when that decision was actually the Universities' prerogative, and (d) the Allocation Forms sent to the Universities were compliant with §179D, and contained all the required information necessary to make the forms "true, correct and complete."   All of Alliant's representations were false.

37.     Alliant's fraudulent and deceptive practices were accomplished through four main types of communication. First, an initial telephone call from an Alliant Government Relations Specialist ("GRS") to a University construction employee. Second, a follow-up email from the Alliant GRS to the University employee. Third, the Alliant §179D Allocation Form which was attached to the follow-up email; and Fourth, other miscellaneous communications.  The particulars regarding the Alliant initial telephone calls, follow-up emails, and Allocation Forms for the §179D allocations made to Alliant clients by the Universities are set out in the attached Exhibit 2.

---

38.    <u>Alliant Initial Telephone Calls</u>.   The initial Alliant phone call was placed by an Alliant GRS.  Alliant has conceded that while no accounting, tax or construction experience was necessary for that position, prior "sales" experience was a requirement.  Rather than contact the University tax or legal department, the Alliant GRS was instructed to contact a construction and planning employee, most of whom had never heard of §179D.  During these initial phone conversations, the Alliant GRS would misrepresent to the University employee that: (a) the §179D deduction was exclusively for the benefit of the designer and had no value to the University, (b) the allocation would require no work on the part of, and would be of no cost to, the University, and (c) Alliant had already selected the appropriate contractor to be designated as the "designer" when that decision was actually the University's to make. (See attached Exhibit 2)

39.    <u>The Alliant Follow-Up Emails</u>.  Following the initial Alliant phone calls, the Alliant GRS sent a follow-up email to the University.  A representative email from Alliant GRS Holly Schutt to UH System employee Jonathan Thurston is attached hereto as Exhibit 4.   In these standard emails, Alliant misled the Universities regarding the significance of the Allocation Forms by representing that it was merely a "very simple first step for our client", and by several times referring to it as simply a "letter".  The email further misrepresented that the Allocation Form was simply being sent as a "checks and balances system" to

confirm that the contractor worked on the project in question.  Further, the email misrepresented that the contractor in question was entitled to receive the full benefit from the §179D deduction, which would preclude the University from receiving any compensation.  Finally, the email misrepresented that the attached Allocation Form "just ensures that an energy service provider did actually participate in the construction and the improvements of the project." (See attached Exhibit 2)

40.   <u>The Alliant Allocation Forms</u>.  The Allocation Form was almost always attached to the follow-up email.  The Allocation Form misrepresented to the Universities that it contained a "true, correct, and complete" statement of facts required by the Internal Revenue Service.  In particular, Alliant knew that the IRS required the Allocation Form to set forth the "amount of the Section 179D deduction being allocated", but submitted Allocation Forms to the Universities which did not contain the deduction "amount".  Further, the Allocation Forms represented that the particular contractor had already been identified and designated as the "designer" by Alliant, when the IRS mandated that the property owner determine the primary designer to receive the entire 179D allocation, or to determine several qualified designers to split the allocation.  Further, Alliant falsely represented in the Allocation Forms that the Forms could be completed prior to the necessary energy modeling, third-party certification and determination

of the proper allocation amount in violation of Section 179D and I.R.S. Notice 2008-40.

41.     In addition, on numerous projects, Alliant presented Allocation Forms to the Universities on behalf of Alliant clients seeking the entire §179D deduction, when those clients did not qualify as the primary "designer" under §179D.  These include Vaughn on the UH Jaguar Suites project, Hoar on the UH Fleming Teaching Addition project, Bartlett on the UT San Antonio Parking Garage project, Dynamic on the UT Galveston Sealy Hospital project, Hill & Wilkinson on the five UT Dallas Dining and Student Housing projects, SpawGlass on the UT Housing 32, 33, 34 and 35 project, JMEG on the UTSA North Paseo and UT Dallas Student Services projects, Vaughn on the UT South Texas Research Facility and UT San Antonio Student Housing Phase III projects.

42.     <u>Miscellaneous Communications</u>.   On other occasions, Alliant made other miscellaneous misrepresentations:

a.       In deflecting questions regarding its Section 179D practices, Alliant has since 2012 represented to numerous governmental entities, including the UT System and UH System, that one of its principals, Dean Zerbe, personally drafted the Section 179D legislation.   Those representations were false.  As recently has August 2, 2017, Alliant held a webinar entitled "Tax Benefits for Working on Government Buildings" to

discuss claiming Section 179D deductions on government-owned buildings. During that webinar, Alliant represented that Mr. Zerbe authored Section 179D.  After being challenged about that claim, Alliant sent an email to all webinar participants on August 4, 2017 admitting that Mr. Zerbe did *not*, in fact, author the Section 179D provision, but rather, the "Section 179D provision passed in 2005 as part of the energy bill was thanks primarily to the efforts of Senators Snowe (R-ME) and Bingaman (D-NM) and the key Republican finance committee tax counsel responsible for the provision was Elizabeth Harris."

b.      Alliant falsely represented that both Federal and state law require the Universities to simply sign away Section 179D deductions, without recovering any corresponding compensation or value, to the detriment of the Universities and Texas taxpayers.  For example, on March 9, 2016, Alliant GRS Sarah Marks threatened UH System legal counsel that the University's attempt to receive value in exchange for a §179D deduction was "illegal".

c.      Because an Allocation Form must be executed by an authorized government representative based upon facts that are "true, correct and complete", the Allocation Form cannot be signed until: (i) the energy modeling has occurred, (ii) the building has been independently certified as

energy efficient, and (iii) the amount of the allocation has been determined and included in the Allocation Form.  Nevertheless, Alliant always attempts to obtain executed Allocation Forms from governmental entities *prior to* any energy modeling of the building, any independent certification of energy efficiency, and any computation of the §179D deduction amount.   In addition, Alliant omits the amount of the §179D deduction from the Allocation Form so that the government employees do not realize the value of what is being signed away.

      d.      Alliant misrepresented, by omission, that a transfer by Plaintiffs of Plaintiffs' Section 179D deductions would require Plaintiffs to reduce the basis of the University Projects.

## <u>COUNT ONE – DECLARATORY JUDGMENT</u>

43.     Plaintiffs bring this claim against both Defendants, and Plaintiffs reallege the facts stated in 1-42 above as if set forth specifically herein.

44.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Plaintiffs seek a declaration of the rights and legal relations of the parties in connection with the above described transactions including the validity of the Plaintiffs' allocation of §179D deductions to WHR.

45.     While Defendants contend that Plaintiffs are seeking and advisory opinion, whether the allocations to WHR are void because WHR failed to pay

"adequate compensation" in exchange, and/or the University employees signing the Allocation Forms did not have the actual authority to do so, are issues central to this case. *See* specifically paragraphs 29-34, *supra*.

46.    Plaintiffs request this Court to enter declaratory judgment that:

a.    Article III, Section 51 of the Texas Constitution prohibits Plaintiffs from making a grant of public funds, property or contract rights to any individuals, associations or corporations without a corresponding receipt of "adequate compensation".

b.    Tex. Gov. Codes 447.004(b-3) does not require Plaintiffs to allocate §179D deductions to any private person or entity unless it receives "adequate compensation" in return.

c.    Tex. Gov. Code § 447.004(b-3), to the extent it mandates the allocation of §179D deductions by the Plaintiffs, without adequate compensation in return, is unconstitutional in violation of Art. III, Section 51 of the Texas Constitution.

d.    Texas Government Code § 447.004(b-3), to the extent it requires the Plaintiffs to allocate §179D deductions, is preempted by 26 U.S.C. § 179D, and the IRS Notices and Memoranda regarding §179D, in that those authorities make such allocations permissive, and not mandatory.

e.     The UH System's allocation of its §179D deduction to WHR, dated July 3, 2013, for the UH Transformation GMP Phase II project, is *void ab initio* because of the lack of any compensation paid by WHR to the UH System in return for the allocation.

f.     The UH System's allocation of its §179D deduction to WHR, dated August 7, 2013, for the UH Stadium Garage project, is *void ab initio* because of the lack of any compensation paid by WHR to the UH System in return for the allocation.

g.     The UT System's allocation of its §179D deduction to WHR, dated July 10, 2013, for the MD Anderson Cancer Center 1 MC Building project and MD Anderson Cancer Center Mid Campus Parking project, is *void ab initio* because of the lack of any compensation paid by WHR to the UT System in return for the allocation.

h.     The UT System's allocation of its §179D deduction to WHR, dated July 15, 2013, for the UT HSC Phases I & II project and the UT HSC Level 4 project, is *void ab initio* because of the lack of any compensation paid by WHR to the UT System in return for the allocation.

i.     The UT System and UH System employees who executed the four (4) Allocation Forms to WHR did not have the actual authority to execute those forms.

j.      The UH System's allocation of its §179D deduction to WHR, dated July 3, 2013, for the UH Transformation GMP Phase II project is *void ab initio* because the UH System employee signing on behalf of the UH System did not have actual authority to execute the Allocation Form.

k.      The UH System's allocation of its §179D deduction to WHR, dated July 3, 2013, for the UH Stadium Garage project is *void ab initio* because the UH System employee signing on behalf of the UH System did not have actual authority to execute the Allocation Form.

l.      The UT System's allocation of its §179D deduction to WHR, dated July 10, 2013, for the MD Anderson Cancer Center 1 MC Building project and MD Anderson Cancer Center Mid Campus Parking project is *void ab initio* because the UT System employee signing on behalf of the UT System did not have actual authority to execute the Allocation Form.

m.      The UT System's allocation of its §179D deductions to WHR, dated July 15, 2013, for the UT HSC Phases I & II project and the UT HSC Level 4 project, is *void ab initio* because the UT System employee signing on behalf of the UT System did not have actual authority to execute the Allocation Form.

## COUNT TWO – 18 U.S.C. § 1962(c)

47.     This claim is brought against Defendant Alliant only, and Plaintiffs reallege the facts stated in paragraphs 1-46 above as if set forth specifically herein.

### Enterprises Operated and Managed by Alliant

48.     WHR, Bartlett, Dynamic, Jacobs, JMEG, PSP, Vaughn, Shah, Spawglass, SWA, Trinity, Tellepsen, Hoar and H&W constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Client Enterprise").

a.     WHR, Bartlett, Dynamic, Jacobs, JMEG, PSP, Vaughn, Shah, Spawglass, SWA, Trinity, Tellepsen, Hoar and H&W share the common purpose of (among other things) collaborating with Alliant to secure tax benefits and, in particular, share the common purpose of inducing governmental entity building owners, including the UT System and the UH System, to allocate Section 179D Deductions to members of the Client Enterprise.

b.     WHR, Bartlett, Dynamic, Jacobs, JMEG, PSP, Vaughn, Shah, Spawglass, SWA, Trinity, Tellepsen, Hoar and H&W are related in that they are all clients of Alliant and have all been contractors on UT System and UH System building projects.

c.      The Client Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Client Enterprise has operated since sometime after the passage of the Energy Policy Act of 2005, continues to operate, and, under the direction of Alliant, has fraudulently obtained millions of dollars worth of Section 179D Deductions from the UT System and UH System, and continues to fraudulently induce other governmental entity building owners to allocate Section 179D deductions to members of the Client Enterprise.

49.      Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of the Client Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud described, *supra*, in paragraphs 57 (a)-(s).

50.      In the alternative to paragraphs 48-49, WHR, Bartlett, Dynamic, Jacobs, JMEG, PSP, Vaughn, Shah, Spawglass, SWA, Trinity, Tellepsen, Hoar and H&W as legal entities, each constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).  Alliant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), which individually conducts, participates in, engages in, and operates and manages the affairs of WHR, Bartlett, Dynamic,

Jacobs, JMEG, PSP, Vaughn, Shaw, Spawglass, SWA, Trinity, Tellepsen, Hoar and H&W through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consists of, but is not limited to, the acts of mail and wire fraud described, *supra*, in paragraphs 57 (a)-(s).

## Pattern of Racketeering Activity

51.    At all relevant times, the enterprises alleged in paragraphs 48-50 were engaged in, and their activities affected, interstate commerce and foreign commerce.

52.    All of the acts of racketeering described in paragraphs 35-42 and 57 (a)-(s) were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud the UT System or UH System of the value of their §179D deductions, their common result was to defraud the UT System or UH System of the value of their §179D deductions; Alliant, through its agents or clients, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; the UT System or UH System were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

53.     All of the acts of racketeering described in paragraphs 35-42 and 57 (a)-(s) were continuous so as to form a pattern of racketeering activity from July 2013 through February 2016 (at a minimum) and/or the acts of racketeering threaten to continue indefinitely against other governmental entity building owners as the acts of racketeering are the regular way in which Alliant does business. Alliant's acts of racketeering against the UT System and UH System stopped only after the Universities discovered Alliant's scheme to defraud and took action to protect themselves.

## Wire Fraud 18 U.S.C. § 1343

54.     Alliant engaged in a systemic and ongoing scheme with the intent to defraud, deceive, mislead and/or fraudulently induce Plaintiffs to allocate their §179D deductions to Alliant's clients, and knowingly devised or knowingly participated in the scheme or artifice to defraud the Plaintiffs to obtain the Universities' §179D deductions by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343.

55.     Alliant's fraudulent and deceptive practices identified in paragraphs 35-42 and the attached Exhibit 2 are contrary to public policy and fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in violation of 18 U.S.C. § 1343.

56.     Alliant used the interstate wires "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, and/or carrying out the scheme, all within the meeting of 18 U.S.C. § 1343.  In particular, Alliant used the interstate wires to send emails and non-compliant Allocation Forms, all of which contained false statements and information as specified in paragraphs 35-42 and 57 (a)-(s), and the attached Exhibit 2.

57.     Alliant specifically used the interstate wires, or caused the interstate wires to deliver, the following false, deceptive, and misleading statements set forth in paragraphs 35-42, *supra*, including, but no limited to the following false, deceptive, and misleading communications:

a.      On July 2, 2013, Alliant GRS Holly Schutt sent an email to UH employee Jonathan Thurston with an attached §179D Allocation Form relating to the University Center GMP Phase II project.  The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

b.      On July 3, 2013, UH sent an email to Alliant suggesting that UH should receive the value, or a portion of the value, of the §179D deduction that WHR was requesting relating to the University Center GMP Phase II project.  As a clear indication that the UH system did not understand the amount of the deduction involved, UH's Mr. Thurston indicated "I'm not really certain what kind of money we are talking about but [UH receiving a portion of the §179D deduction value] would seem to be an interesting topic of discussion".  Shortly after receiving that email, Alliant representative Holly Schutt falsely represented to the UH System that it could not benefit from the §179D deduction.

c.      On August 6, 2013, Alliant GRS Holly Schutt sent another email with attached Allocation Form to Mr. Thurston regarding the UH Stadium Garage project.  The email and Allocation Form were fraudulent

and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

d.      On February 14, 2014, Alliant GRS Katie Fugnetti sent an email to Mr. Thurston regarding the UH Cougar Place project. The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

e.      On February 14, 2014, Alliant GRS Katie Fugnetti spoke with UH employee Maggie Manley regarding the UH Cougar Place project. Alliant misrepresented to UH that the §179D deduction was only available to PSP, and thus precluding the UH System from receiving any benefit from the §179D deduction. Ms. Fugnetti falsely represented that Section 179D "does not reward the building owner".

f.      On February 25, 2014, Alliant GRS Katie Fugnetti sent an email and attached Allocation Form to UH employee Katherine Miller regarding the UH Cougar Place project. The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

g.      On March 31, 2015, Alliant Director of Government Relations Ashley Gold falsely represented to the UH System that PSP was entitled to the entire §179D deduction regarding the TDECU Stadium project. The Allocation Form attached was fraudulent and deceptive for the particular reasons listed in paragraph 35-42 above, and as identified in the attached Exhibit 2.

h.      On January 21, 2014, Alliant GRS Holly Schutt sent an email to UH employee Jonathan Thurston with an attached Allocation Form relating to the UH Central Plant project. The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

i.      On August 9, 2013, Alliant GRS Cassandra Turner sent an email with attached Allocation Form relating to the UH Jaguar Suites project. The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

j.       On August 15, 2013, Alliant GRS Cassandra Turner sent an email with a form letter authored by Alliant Group National Managing Director Dean Zerbe and Alliant Group Vice President Mark W. Iverson dated March 10, 2012.  Alliant, in a clear attempt to bolster the validity of its fraudulent §179D practices, misrepresented that Dean Zerbe was a former United States Senator and that Mr. Zerbe co-authored §179D.  Both of those statements were false.

k.       On or about August 16, 2013, Alliant GRS Cassandra Turner falsely represented to UH employee John Posch that Smith & Company was entitled to the entire §179D deduction regarding the UH Jaguar Suites project, thus precluding the UH System from receiving any benefit from the §179D deduction.

l.       On January 21, 2014, Alliant GRS Holly Schutt sent an email with attached Allocation Form to UH employee Kelly Buehler.  The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

m.      On July 3, 2013, Alliant GRS Holly Schutt sent an email to UT employee Lawrence Kubacak with an attached §179D Allocation Form relating to the MD Anderson Cancer Center project.  The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

n.      On July 15, 2013, Alliant GRS Holly Schutt sent an email with attached Allocation Form to UT Employee William Stewart regarding the UT HSC project.  The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

o.      On December 13, 2013, Alliant GRS Holly Schutt sent an email with attached Allocation Form to UT employee Dayle Pettus regarding the UTD Parking Structure project.  The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

p.      On December 13, 2013, Alliant GRS Holly Schutt sent a second email to Mr. Pettus with attached Position Paper and demand for the §179D allocation.  In the Position Paper, Alliant falsely represented that UT

was obligated to make the allocation to Vaughn under both Federal and state law.  By this time, Alliant was aware of other instances in which governmental entities had shared in the value of §179D deductions.

q.  On July 15, 2013, Alliant Government Relations Specialist Jennifer Marilley sent an email and attached Allocation Form to UT employee Vince Yauger regarding a number of UTD projects.  The email and Allocation Form were fraudulent and deceptive for the particular reasons listed in paragraphs 35-42 above, and as identified on the attached Exhibit 2.

r.  On March 31, 2015, Alliant GRS Holly Schutt falsely represented to the UT System that SpawGlass was entitled to the entire §179D deduction regarding the UT Southwest Medical projects, thus precluding the UT System from benefitting from the §179D deduction.  Alliant's email included an Allocation Form which misrepresented to the UT System that it contained a "true, correct and complete" statement of facts as required by the Internal Revenue Service.  In particular, Alliant knew the Allocation Form must contain the dollar amount of the §179D deduction, but misrepresented to the UH System that it did not.

s.  On March 9, 2016, Alliant GRS Sarah Marks falsely represented to the UH System that seeking to receive value in exchange for a §179D allocation was "illegal."

58.  Each and every use of the interstate wires described above was committed by Alliant with the specific intent to defraud Plaintiffs to allocate their §179D deductions without compensation, by means of false or fraudulent pretenses, representations, or promises.  Alliant's acts of wire fraud in violation of 18 U.S.C. § 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

**Causation, Reliance and Damages**

59.     As a direct and proximate result of, and by reason of, the activities of Alliant, and its conduct in violation of 18 U.S.C. § 1962(c), the Universities were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). The UH System and UT System Allocation Forms were signed by the Universities' employees identified in Exhibit 2 attached hereto.  The Universities' employees who executed the Allocations Forms to Alliant's clients, justifiably relied on the misrepresentations set forth in paragraphs 35-42 and 57 (a)-(s).  The Universities suffered damages because they were fraudulently induced to allocate §179D deductions to Alliant's clients without receiving adequate value in return.  See also paragraphs 61-66 below.

## <u>COUNT THREE – FRAUD AND MISREPRESENTATION</u>

60.     This Count is against Defendant Alliant only, and Plaintiffs reallege the facts stated in paragraphs 1-59 above as if set forth specifically herein.

61.     Alliant, on behalf of itself and its client WHR, misrepresented to Plaintiffs that: (i) the proffered Allocation Forms were compliant with §179D and the applicable IRS Notices; (ii) the Allocation Forms set forth all information required by §179D, and that the facts set forth therein were "true, correct, and complete when Alliant knew the Allocation Forms must state the "amount" of the §179D deduction, which the Alliant forms did not; (iii) the Allocation Forms "just

---

ensure that an energy service provider did actually participate in the construction and the improvements of the project" when Alliant knew that the Allocation Forms purported to transfer Plaintiffs' Section 179D deductions and would be used by Alliant's client when filing their tax returns to claim substantial tax deductions and to enrich Alliant; (iv) the Allocation Forms could be completed prior to the necessary energy modeling, third-party certification and the determination of the proper § 179D deduction amount; and (v) Plaintiffs were legally required to execute the Allocation Forms transferring deductions to WHR and Alliant's other contractor clients, without any compensation to the Universities.  See the identified misrepresentations set forth in paragraphs 35-42, *supra*.

62.     Alliant's representations were material.  Further, Alliant either knew the representations were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth. Alliant made the representations with the intent that Plaintiffs rely on them, and Plaintiffs did in fact rely on the representations by, among other things, executing the Allocation Forms to transfer the Universities' §179D deductions to WHR and Alliant's other clients, without receiving adequate consideration in return.

63.     Alliant's misrepresentations caused Plaintiffs damage.  But for the misrepresentations and deceptive practices set forth in paragraphs 35-42, *supra*, the University employees who executed the Allocation Forms to Alliant's clients

would not have executed those forms.   In particular, had Alliant not falsely represented that its clients were entitled to all of the Universities' §179D deductions, and thus the Universities were precluded from benefitting at all from the §179D deductions, the University employees would not have signed the Allocation Forms, including the Forms to WHR.   In addition, none of the employees signing the Allocations Forms would have done so had Alliant stated the amount of the §179D deductions on the Allocations Forms.   Had the §179D deduction amounts been identified, the University employees would not have signed the forms because their signatory authority was limited by Board of Regents policies to a small fraction of the §179D deduction amounts, and they would not have blindly signed away tax deductions in amounts, in many cases, exceeding $100,000.00.   This includes the Allocation Forms to WHR.

64.   Further, but for Alliant's misrepresentations that the Alliant clients were entitled to all of the Universities' §179D deductions, thus precluding the Universities from sharing in any benefit from the deductions, the Universities would have negotiated "adequate compensation" in exchange for the §179D allocations as required by the Texas Constitution.   The Universities would not have allocated §179D deductions without receiving compensation in return.   They are not doing so now, and they wouldn't have done so earlier if not for Alliant's fraud.

65.    The Universities would have negotiated with companies qualifying as designers pursuant to §179D.  That is exactly what the Universities have done since they uncovered Alliant's fraud.  Both the UT System and UH System have incorporated provisions within their standard construction contracts which require the successful bidder to enter into good faith negotiations with the Universities as to the allocation of §179D deductions between the University and the designer. Both Universities are now receiving compensation in exchange for their §179D allocations, which would have occurred earlier if not for Alliant's fraud and misrepresentations.

66.    Further, the Universities, had they not been defrauded, would have negotiated to share in the value of the §179D deductions with companies working on the University projects which were not Alliant clients.  In many instances, the Alliant client identified on the Allocation Forms submitted to the Universities were not the primary designer pursuant to §179D.  The Universities would have negotiated with the primary designers to share in the §179D deductions.  Those alternative designers are Alamo Architects, HDR Architects, HKS, Inc., Chesney Morales,  Purdy McGuire-Yaggi Engineering,  Alderson Engineering,  Alamo Architects, Rafael Vinoly Architects, Kirksey Architecture, DBR Engineering, E&C Engineers and Consultants, PGAL Architects, Affiliated Engineers, Inc., and Bailey Architects, Inc.

## COUNT FOUR – UNJUST ENRICHMENT

67.     This claim is brought against both Defendants, and Plaintiffs reallege the facts stated in paragraph 1-66 above as if set forth specifically herein.

68.     The Allocation Forms identified above are *void ab initio*, and were obtained from Plaintiffs by fraud, taking undue advantage, and/or mutual mistake. Therefore, Plaintiffs are entitled to recover from Defendants all benefits they received by use of the void Allocation Forms.

69.     The amount of unjust enrichment received by WHR, computed as WHR's tax savings minus the payments made by WHR to Alliant, totals $1,810,541.00.   Of this total, $882,961.00 is owed to the UT System and $198,580.00 is owed to the UH System.

70.     The amount of unjust enrichment received by Alliant, as computed by the amounts paid to Alliant by its designer clients with respect to the UT System projects and UH System projects, and identified in the Joint Stipulation of Facts filed under seal as Exhibit 1, totals $1,442,715.00.  Of that total, the UT System is owed $1,145,969.00 and the UH System is owed $296,746.00.

## PRAYER

Plaintiffs request that their request for declaratory judgment against Defendants be granted, that Plaintiffs recover their actual damages, treble damages, disgorgement, restitution, recoupment of Defendants' unjust enrichment,

exemplary damages, pre- and post- judgment interest, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Michael E. McCue
Michael E. McCue
State Bar No. 13494150
Alex J. Pilawski
State Bar No. 24074899
Matt L. Roberts
State Bar No. 24098330
Meadows, Collier, Reed, Cousins,
   Crouch & Ungerman, LLP
901 Main St., Suite 3700
Dallas, TX 75202
Telephone:         214-744-3700
Facsimile:214-747-3732
mmccue@meadowscollier.com
apilawski@meadowscollier.com

ATTORNEYS FOR PLAINTIFFS
THE UNIVERSITY OF TEXAS
SYSTEM AND THE UNIVERSITY
OF HOUSTON SYSTEM